UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NAQUAN M. LECKIE,

                        Plaintiff,

          -against-

THE CITY OF NEW YORK, CAPTAIN JONES, and
CORRECTION OFFICER LING,

                        Defendants.
------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, Chief United States District Judge.

**MEMORANDUM AND ORDER**
18-CV-3917 (RRM) (LB)

      Plaintiff Naquan M. Leckie, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983, against defendants City of New York, Captain Ashley Jones ("Jones"), and Correction Officer Chi Ling ("Ling"), alleging deliberate indifference to his safety in connection with an allegedly homophobic inmate-on-inmate attack on December 25, 2017. (Compl. (Doc. No. 2).) Defendants now move for summary judgment. (Mot. (Doc. No. 59).) For the reasons stated below, defendants' motion is granted in part and denied in part.

## BACKGROUND

Factual Background

      The relevant facts outlined below are drawn from defendants' Local Rule 56.1 Statement of Material Facts, to the extent that those facts are supported by evidence submitted by defendants in connection with the motion for summary judgment.[1] Unless otherwise noted, the facts are undisputed.

---

[1] Defendants' motion is unopposed. In the case of an unopposed motion for summary judgment, "in determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (stating that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

On December 25, 2017, Naquan Leckie was a pre-trial detainee incarcerated at Brooklyn Detention Complex ("BKDC"), a New York City Department of Correction ("DOC") facility located at 275 Atlantic Avenue in Brooklyn.  (Defendants' Rule 56.1 Statement of Undisputed Facts ("Defs.' SOF") (Doc. No. 61) at ¶ 3.)  Prior to being housed at BKDC, Leckie was held at Manhattan Detention Center ("MDC"), but was transferred out of that complex on December 14, 2017, because "the guys in there felt like [Leckie] was gay because [he] had took a shower, but [he] had [his] drawers on."  (Excerpt from Leckie Deposition, Exhibit B (Doc. No. 60-3) at 5.)[2]

In accordance with the Prison Rape Elimination Act ("PREA") and DOC policy, upon his arrival at BKDC, Leckie participated in an initial intake interview and was asked whether he considered himself to be lesbian, gay, bisexual, transgender, intersex or gender nonconforming. (Defs.' SOF at ¶ 7.)  During the intake interview, Leckie indicated that he did not identify as such and said that he was straight.  (*Id*. at ¶ 8.)  At no point did Leckie inform Ling, Jones, or any other correctional staff of his sexual orientation or alert them of any risks to his safety due to his sexual orientation.  (*Id*. at ¶ 9.)  However, Leckie told correction officials that he feared for his life due to his previous gang affiliation and was placed in protective custody at BKDC.  (*Id*. at ¶ 5.)  Leckie testified that he submitted a signed statement that he feared for his life because he "did not want to be around the people that he was around."  (*Id*. at ¶ 6.)  Leckie testified that prior to the incident on December 25, 2017, he did not fear for his life, did not fear any particular individual, and did not believe he was in danger, nor had any inmates made any threats against him.  (*Id*. at ¶ 4.)

At BKDC, Leckie was housed in a protective custody housing area located on the sixth floor, Housing Area 6B.  (*Id*. at ¶ 10.)  A protective custody housing area is a housing area where

---

[2] All page numbers refer to ECF pagination.

inmates can be placed on a voluntary or involuntary basis to protect them from fears or threats pertaining to their physical safety concerns. (*Id*. at ¶ 11.) Inmates placed in protective custody are afforded the same lock-in/lock-out privileges and access to mandated services and programs as general population inmates but are segregated from the rest of the inmate population. (*Id* at ¶ 12.) The Housing Area Supervisor is not informed of the reason that an inmate is placed in protective custody. (Declaration of Correction Captain Ashley Jones ("Jones Dec.") (Doc. No. 64) at ¶ 4.) There are four housing areas located on the sixth floor: Housing Areas 6A, 6B, 6C, and 6D. (Defs.' SOF at ¶ 14.) Each housing area consists of two tiers, a dayroom, and houses approximately 20–28 inmates. (*Id*. at ¶ 15.) The dayroom is a common area recreation room where inmates can unwind, watch television, play games, and/or talk on the phone. (*Id*. at ¶ 16.)

On the day of the incident, as the Housing Area Supervisor, Jones was responsible for conducting tours of approximately eight housing areas, including Housing Area 6B. (*Id*. at ¶ 17.) Sometime prior to 6:15 p.m. that day, Jones conducted a security inspection of Housing Area 6B. (*Id*. at ¶ 18.) During the security inspection, Jones did not have any communication with Leckie and Leckie could not hear any communication that Jones may have had with any other inmates. (*Id*. at ¶ 19.)

At that same time, Ling was manning the control post for Housing Areas 6A, 6B, 6C, and 6D, where he was responsible for communicating with other parts of the facility, such as the Control Room, the Area Supervisor, Law Library, Social Services, Commissary, and the Kitchen. (*Id*. at ¶ 20.) The control post for Housing Areas 6A, 6B, 6C, and 6D was approximately 20 feet away from the Housing Area 6B dayroom; Housing Areas 6A, 6B, 6C, 6D, and their respective dayrooms were in partial view from the control post. (*Id*. at ¶ 21.)

The parties disagree as to the details of the incident.  At his deposition, Leckie testified that Jones entered the dayroom while he was playing chess, looked around the room, and then said, "come on, guys, let's have an exciting day."  (Deposition of Naquan Leckie ("Leckie Dep.") (Doc. No. 60-2) at 9.)  Jones states in her declaration that she did not "have any communication with" Leckie "at any point" during her security inspection in Housing Area 6B.  (Jones Dec. at ¶ 7.)   According to Leckie, Jones then stepped out of the dayroom, and several inmates followed her.  (Leckie Dep. at 9.)  They spoke, but Leckie could not hear what was said.  (*Id*.)  Then, those inmates re-entered the room and pointed at Leckie, with at least one of them referring to him as a "faggot" and telling him to go "lock … in now."  (*Id*. at 9–10.)  Leckie testified that he stood up and asked why he was required to lock in when several inmates started to "jump" him.  (*Id*.)  He testified that the attack lasted between a minute and "three or four" minutes and he did not fight back because "when they see you fight back that's when they try to cut you," though he stated that he did not see any of his attackers with a weapon.  (*Id*. at 18.) Defendants assert that the fight lasted about one minute.  (Declaration of Correction Officer Chi Ling ("Ling Dec.") (Doc. No. 63) at ¶ 9.)

Ling was sitting at the control post "when he heard a commotion coming from Housing Area 6B dayroom" and he "immediately responded."  (Defs.' SOF at ¶¶ 22, 24.)  Ling responded by calling the Probe Team and notifying the Area Supervisor by pressing the "personal body alarm on his belt which activated the institutional alarm."  (*Id*. at ¶ 26.)  Ling simultaneously issued verbal commands directing the inmates to stop fighting and gained compliance.  (*Id*. at ¶ 27.)  During this incident, Jones was conducting a security inspection of Housing Area 6C, a different housing area on the same floor that is approximately six feet away from Housing Area 6B but separated by a concrete wall, and so she did not witness the incident.  (*Id*. at ¶¶ 31–32.)

4

After Ling activated the institutional alarm, Jones left Housing Area 6C and immediately returned to Housing Area 6B.  (*Id*. at ¶ 33.)

Upon Jones's arrival to the Housing Area 6B dayroom, Ling reported that Leckie was involved in a physical altercation with inmates Jonathan Sanchez, Christopher Rodriguez, and Lumumba Moss, and further reported that his instructions and direct orders to the inmates to stop fighting had terminated the incident.  (*Id*. at ¶ 34.)  The Probe Team, which arrived within ten minutes of being called by Ling, escorted Leckie, Sanchez, Rodriguez, and Moss outside of the housing area.  (*Id*. at ¶ 35.)  All four inmates were taken to the clinic and subsequently rehoused in different housing areas.  (*Id*. at ¶ 36.)

Leckie was treated at the clinic by Dr. Iosif Shpits, M.D.  (*Id*. at ¶ 37.)  An "injury to inmate" report and medical record were generated, to reflect that Leckie complained of arm pain, denied loss of consciousness or blurry vision, was diagnosed with a left-hand contusion, and was given 800mg of Ibuprophen for the pain.  (*Id*.; *see also* Injury to Inmate Report Ex. D; *see also* Medical Records Exhibit E.)  The Injury to Inmate Report, which is handwritten and only partially legible, also indicates "lump on scalp" but "no bleeding no wound."  (Exhibit D.)  The Medical Records indicate that Leckie had "no scalp lesions" and that his nose had normal pink mucosa.  (Exhibit E at 2.)

Ling issued Notices of Infraction to Sanchez, Rodriguez, and Moss, charging them with fighting and refusing to obey direct orders.  (*Id*. at ¶ 39.)  After generating these Notices of Infraction and submitting them to Jones, Ling's involvement in the incident concluded.  (*Id*. at ¶ 40.)  Upon receiving these Notices of Infraction, Jones investigated each infraction, completed an Investigation Report, and referred Sanchez, Rodriguez, and Moss to the Adjudication Unit for a hearing.  (*Id*. at ¶ 41.)  Jones recommended the maximum penalty indicated.  (*Id*.)

5

When asked at his deposition whether any of the inmates who had attacked him had previously threatened him, Leckie said, "they just looked and stared at me but they never said nothing … they looked at me but they never did nothing physically to make it look like they were trying to harm me." (Leckie Dep. at 10.)

The Complaint

Leckie timely filed his complaint on June 26, 2018, as a form § 1983 complaint that does not allege any causes of action. Rather, the complaint attaches a narrative. Leckie asserts that while his assailants were kicking him in the face, punching him in the head and arms, and calling him a "faggot" a "gay ass nigga" and saying "I hate you you fucking homo," Ling was outside of the room but "didn't bother to come in and help. He just watched from the outside and [Leckie] was screaming for them to stop but they didn't listen." (Compl. at 6–7.) Leckie further alleges that Jones, who was initially "across the room on the other side patro[l]ling," "never came to diffuse the situation" when she returned to Housing Area 6B, but "just walk[ed] the other way as though nothing was happening." (*Id*. at 7–8.) Leckie also states that it is "very suspicious" that the assault occurred immediately after Jones had a conversation with the inmates who attacked him. (*Id*. at 8.) Finally, Leckie asserts that the cameras in the facility were not operable, placing the facility "out of compliance." (*Id*. at 7.) For the injuries he suffered in the attack, including a bloody nose and bruises and bumps to his head an arms, as well as the mental anguish and discriminatory conduct, unsafe environment, and the threats to his life and safety, Leckie seeks $30 million in damages. (*Id*. at 4, 10.) The Court construes this narrative as raising two deliberate indifference claims against all defendants, for failure to protect Leckie prior to the attack and failure to intervene during the ongoing attack, as well as an excessive force claim against Jones for inciting the attack.

6

The Instant Motion

Defendants now bring the instant motion for summary judgment. Defendants construe Leckie as bringing only deliberate indifference to safety claims under § 1983, and do not brief the excessive force claim. Defendants first argue that Leckie has failed to demonstrate a sufficiently serious condition, as Leckie had not notified Jones, Ling, or anyone else at BKDC that he felt unsafe or that he anticipated a threat to his safety due to his sexual orientation or the conditions of his confinement in Housing Area 6B, nor did Leckie inform anyone at BKDC that he was bisexual. (Mem. (Doc. No. 62) at 12–16.) Next, Defendants argue that Leckie's injuries do not satisfy the objective standard for deliberate indifference because they were not sufficiently serious. (*Id.* at 17–18.) Further, Defendants argue that Leckie also fails to demonstrate that either Ling or Jones was deliberately indifferent, as he cannot show that the Defendants were aware of the risk of attack by other inmates or that they failed to intervene to stop it. (*Id.* at 18–19.) Additionally, Defendants argue that the surprise attack is insufficient to support a claim of deliberate indifference. (*Id.* at 20–21.) Moreover, Defendants assert that the claim against Jones must fail as she was not present for the attack and thus Leckie cannot show personal involvement. (*Id.* at 21–22.)

Defendants also argue that Ling and Jones are entitled to qualified immunity because neither of them violated a clearly established right, nor were they on notice to any risk of harm due to Leckie's sexual orientation. (*Id.* at 24.) Viewing Ling's actions in the light most favorable to him, his actions could be construed as a reasonable officer's determination of the safest and most effective way to intervene in the fight. (*Id.* at 24–25.) Finally, Defendants argue that Leckie has failed to state a claim against the City of New York because he has failed to

provide any evidence that a policy or custom exists that resulted in the deprivation of a constitutional right. (*Id*. at 25–27.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it may impact the "outcome of the suit under the governing law." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions . . . in the light most favorable to the party opposing the motion." (citations omitted)).

The same standards for summary judgment apply where, as here, the non-movant is proceeding *pro se*. *Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015). However, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).

## DISCUSSION

I. **Deliberate Indifference**

42 U.S.C. §1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable." To state a § 1983 claim brought under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must allege two elements, one subjective and one objective. First, to establish an objective deprivation, the pre-trial detainee "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (internal quotations and citations omitted). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Id*. at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (internal quotations omitted)). Second, the pre-trial detainee must "prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id*, at 35.

a. **Failure to Protect**

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). However, "not every injury that a prisoner suffers at the hands of another [prisoner] results in constitutional liability." *Taylor v.*

9

*City of New York*, No. 16-CV-7857 (NRB), 2018 U.S. Dist. LEXIS 52308, at *29 (S.D.N.Y. Mar. 27, 2018) (citing *Farmer*, 511 U.S. at 834). To establish a failure to protect claim under the Fourteenth Amendment, an inmate must satisfy a two-pronged test demonstrating that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) that prison officials demonstrated deliberate indifference to plaintiff's safety. *See Molina v. County of Westchester*, No. 16-CV-3421, 2017 U.S. Dist. LEXIS 65195, at *2–3 (S.D.N.Y. Apr. 28, 2017) (applying the *Farmer* test to Fourteenth Amendment failure to protect claim). When the claim is based on an alleged failure to prevent harm or provide safety, the inmate must show that he "[was] incarcerated under conditions posing a substantial risk of harm." *Lynch v. Jane Doe Corr. Officer Blue*, No. 14-CV-6919 (VB), 2016 U.S. Dist. LEXIS 24683, at *7 (S.D.N.Y. Feb. 29, 2016) (quoting *Farmer*, 511 U.S. at 834).

Defendants are entitled to summary judgment with respect to Leckie's claims of deliberate indifference as to Jones and Ling. Leckie does not demonstrate that he was incarcerated in conditions that posed a substantial risk of harm, because prior to this attack he testified that he did not fear for his life or safety; further, Leckie had not complained about his attackers, raised concerns about his safety in Housing Area 6B, or otherwise provided notice to Ling or Jones that he was at a substantial risk of harm.

    **b. Failure to Intervene**

Leckie's complaint also appears to allege a deliberate indifference claim against both Ling and Jones for failing to intervene when the fight broke out. "The failure of a correction officer to oversee prisoners, intervene in an attack, or otherwise fail to abide by prison safety protocols may under certain circumstances create a condition which poses a substantial risk of serious harm thus constituting a sufficiently serious constitutional violation." *See Molina* 2017

10

U.S. Dist. LEXIS 65195 at *7 (collecting cases). Specifically, "failing to intervene is a Fourteenth Amendment violation where the officer acted with deliberate indifference to a substantial risk of serious harm to an inmate." *Rosen v. City of N.Y.*, 667 F. Supp. 2d 355, 359–60 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 828 (internal quotation marks omitted)). "In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Id*. at 360.

Here, the undisputed facts show that Ling responded to the altercation – which both Leckie and Ling estimated lasted about a minute – by promptly activating the alarm, summoning a Probe Team, and separating Leckie from the other inmates. Additionally, the undisputed record establishes that Jones was not in the immediate vicinity of the altercation but responded promptly to the institutional alarm. There is nothing in the record to indicate that either Ling or Jones failed to intervene in the incident, let alone that they did so with deliberate indifference. Accordingly, Defendants are entitled to summary judgment with respect to Leckie's deliberate indifference claims against Ling and Jones.

## II. Excessive Force

Though Defendants construe Leckie's complaint as stating only a deliberate indifference claim under § 1983, Leckie's complaint can also be construed as alleging a § 1983 excessive force claim pursuant to the Due Process Clause of the Fourteenth Amendment. "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Though for excessive force claims brought under the Eighth Amendment "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to

cause harm," *Cole v. Fischer*, 379 F. App'x 40, 42 (2d Cir. 2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)), "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically," *Kingsley*, 576 U.S. at 400 (internal quotation marks omitted). Accordingly, to prevail in a Fourteenth Amendment excessive force claim, a pre-trial detainee must demonstrate only that the challenged actions "are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Id*. at 398.

Here, Defendants have failed to show that no reasonable juror could find in Leckie's favor with respect to his excessive use of force claim against Jones. In Leckie's deposition testimony, he states that after Jones announced they were going to have an exciting day, she brought several other inmates out into the hallway and spoke to them, then brought them back into the day room where they immediately attacked Leckie while using homophobic slurs. Jones's own affidavit does not contradict this account: she states only that she did not speak to Leckie during her security check but is silent regarding whether she spoke with other inmates. A reasonable juror could conclude, based on the record, that when Jones spoke with those inmates outside of the day room, she incited them to assault Leckie, and that her statement about having "exciting day" was an allusion to the attack the intend to instigate. Inciting violence is not rationally related to any legitimate government purpose. Accordingly, Leckie's §1983 excessive use of force claim against Jones survives summary judgment.

### III.  Qualified Immunity

Defendants argue only that Ling and Jones are entitled to qualified immunity with respect to the deliberate indifference claims but are silent regarding the claim of excessive force. An individual defendant is entitled to qualified immunity if 1) his or her actions did not violate

12

clearly established law, or 2) it was objectively reasonable to believe that his or her actions did not violate such law. *Warren v. Keane*, 196 F. 3d 330 (2d Cir. 1999); *see also Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (same). "A right is clearly established if the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal quotation marks omitted)). Where a right is clearly established, "the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *Id*. (quoting *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996)).

Jones is not entitled to qualified immunity for her alleged application of excessive force. It is well established that pre-trial detainees cannot be subject to punitive force under the Fourteenth Amendment, and no reasonable official would believe that inciting violence against a bisexual detainee, as Jones is alleged to have done here, falls within the scope of acceptable activity under the Due Process Clause. Accordingly, this argument must fail.

## IV. Municipal Liability

A municipality cannot be held liable as a "person" within the meaning of 42 U.S.C. § 1983 unless the municipality itself was somehow at fault. *Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978). "The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries . . . . Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and deprivation of his constitutional rights.'" *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985), *cert.*

13

*denied*, 480 U.S. 916 (1987) (citing *Tuttle*, 471 U.S. at 824 n.8).  Here, Leckie does not identify a policy or custom in his complaint, nor does he provide any other basis for finding the City of New York liable for the allegations contained therein.  Summary judgment is therefore granted with respect to Leckie's claims against the City of New York.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted with respect to the deliberate indifference claims against Jones and Ling, and all claims against the City of New York. This action is recommitted to Magistrate Judge Bloom for all remaining pre-trial matters, including settlement discussions if appropriate. The Clerk of Court is respectfully directed to mail a copy of this Memorandum and Order to the pro se plaintiff and to note the mailing on the docket.

SO ORDERED.

Dated: Brooklyn, New York
       January 11, 2021

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge